UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>OSCAR BERNABE-MARTINEZ,<br><br>Defendant. | Case No. 1:22-cr-00276-AKB-1<br><br>**MEMORANDUM DECISION AND ORDER RE MOTION TO DISMISS INDICTMENT** |

Pending before the Court is Defendant Oscar Bernabe-Martinez's Motion to Dismiss the Indictment (Dkt. 19), which alleges he violated 18 U.S.C. § 922(g)(5)(A). Section 922(g)(5)(A) makes it unlawful for any person, who is an illegal or an unlawful alien,[1] to possess a firearm. On January 31, 2024, the Court heard oral argument. For the reasons discussed below, the Court denies Bernabe-Martinez's motion to dismiss the indictment.

## I. BACKGROUND

On December 14, 2022, a grand jury indicted Bernabe-Martinez on one count of possession of a firearm by a prohibited person in violation of § 922(g)(5). (Dkt. 1). The indictment alleges Bernabe-Martinez knowingly possessed a firearm, despite knowing he was an alien illegally or unlawfully in the United States. (*Id.* at p. 1). Bernabe-Martinez moves to dismiss the indictment, contending § 922(g)(5)(A) is unconstitutional—as applied to him—based on the Supreme Court's

---

[1] In his briefing, Bernabe-Martinez refers to "non-citizens." That term, however, is inaccurate in the context of § 922(g)(5)(A) because the term includes a broader group of immigrants including, for example, lawful permanent resident aliens. Section 922(g)(5)(A), however, only applies to illegal or unlawful aliens.

**MEMORANDUM DECISION AND ORDER RE MOTION TO DISMISS INDICTMENT - 1**

decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). (Dkt. 19). Bernabe-Martinez argues that he has a right to possess a firearm under the Second Amendment regardless of his immigration status and that § 922(g)(5)(A) violates this right because the statute is not consistent with this nation's historical tradition of firearm regulation. (*See, e.g.*, Dkt. 19 at pp. 17, 24). In support, Bernabe-Martinez files an Expert Report and Declaration of Pratheepan Gulasekaram (Dkt. 19-1);[2] Bernabe-Martinez's declaration (Dkt. 19-2); and the declaration of Bernabe-Martinez's brother, Jose Bernabe-Martinez. (Dkt. 19-3).

## II. LEGAL STANDARD

Rule 12(b) of the Federal Rules of Criminal Procedure allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). A motion to dismiss is generally "capable of determination" before trial if it involves questions of law rather than fact. *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993). Although the court may make preliminary factual findings necessary to decide legal questions presented by a motion, the court may not invade the jury's province. *Id.* "[A] motion requiring factual determinations may be decided before trial if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986) (quotation omitted). Under this standard, "the district court must decide the issue raised in the

---

[2] Although Bernabe-Martinez filed Gulasekaram's Expert Report and Declaration in this case, the declaration's factual background does not identify the facts related to Bernabe-Martinez. (Dkt. 19-1 at p. 3). Rather, the declaration refers to another federal defendant, Vazquez-Ramirez, and appears to have been prepared for Vazquez-Ramirez's case. (*Id.*). *See United States v. Vazquez-Ramirez*, No. 2:22-CR-87-RMP-1, 2024 WL 115224, at *7 (E.D. Wash. Jan. 10, 2024) (discussing Gulasekaram's declaration).

pretrial motion before trial if it is entirely segregable from the evidence to be presented at trial." *Id.* (quotation omitted).

A defendant may seek dismissal of an indictment on the grounds that the statute authorizing the charges is unconstitutional. Such a challenge may be either a facial or an as-applied attack to the statute's constitutionality. To succeed on a facial attack, the moving party must demonstrate "no application of the statute would be constitutional." *Sabri v. United States*, 541 U.S. 600, 609 (2004). Conversely, an as-applied challenge is based on a developed factual record and the statute's application to the defendant. *Spence v. Washington*, 418 U.S. 405, 414 (1974). In this case, Bernabe-Martinez asserts § 922(g)(5)(A) is unconstitutional in violation of the Second Amendment as applied to him.

### III. ANALYSIS

The Second Amendment was adopted in 1791 and codified a "widely understood" preexisting right to bear arms. *Dist. of Columbia v. Heller*, 554 U.S. 570, 592 (2008). It provides that "a well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller,* the Supreme Court conducted a textual and historical analysis to conclude "the Second Amendment conferred an individual right to keep and bear arms," despite the text's reference to "Militia." 554 U.S. at 595. Then, in *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme Court held the Second Amendment right to keep and bear arms applies to the States under the Fourteenth Amendment. *Id.* at 791.

Most recently, in *Bruen*, 597 U.S. at 17, the Supreme Court rejected the Court of Appeals' "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." In its place, the Supreme Court articulated a new standard, holding that:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24. Courts applying this test from *Bruen* generally consider two prongs: whether the Second Amendment's plain text covers the individual's conduct at issue, and if so, whether the Government has shown the regulation at issue is consistent with the Nation's historical tradition of firearm regulation.

In determining whether a challenged regulation is consistent with the Nation's historical tradition of firearm regulation, the Supreme Court explained a court should consider whether "a challenged regulation addresses a general societal problem that has persisted since the 18th century." *Id.* at 26. If, however, the challenged regulation was "unimaginable at the founding," the court must conduct "reasoning by analogy." *Id.* at 28. Namely, the court should determine "whether a historical firearm regulation is a proper analogue for a distinctly modern firearm regulation." *Id.* at 28-29. Making this determination requires considering whether the historical and modern regulations are "relevantly similar." *Id.* at 29. "Two metrics" for determining relative similarity include "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* Further, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* (quotations omitted). Finally, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30.

**MEMORANDUM DECISION AND ORDER RE MOTION TO DISMISS INDICTMENT - 4**

### A. The Second Amendment's Plain Text

Since *Bruen*, a plethora of lower courts have grappled with how to apply the new standard for determining whether a statute violates the Second Amendment, giving rise to numerous, diverse analyses—particularly regarding the first prong of the *Bruen* test. Circuit court authority on the issue varies. For example, in determining whether "the Second Amendment's plain text covers the individual's conduct," *id.* at 17, three circuits have found unlawful aliens "do not belong to the class of law-abiding members of the political community" that the Second Amendment protects. *United States v. Sitladeen*, 64 F.4th 978, 985-87 (8th Cir. 2023) (upholding *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011) ("[T]he protections of the Second Amendment do not extend to aliens illegally present in the country.")); *United States v. Carpio-Leon*, 701 F.3d 974, 969 (4th Cir. 2012) ("[I]llegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection."); *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011) ("Illegal aliens are not 'law-abiding, responsible citizens' or 'members of the political community,' and aliens who enter or remain in this country illegally and without authorization are not Americans as that word is commonly understood.").

Four circuit courts, however, have assumed without deciding that the Second Amendment protects unlawful aliens, including the Ninth Circuit. *See United States v. Perez*, 6 F.4th 448, 450 (2d Cir. 2021) (assuming Second Amendment protects unlawful aliens), *cert. denied*, 142 S. Ct. 1133 (2022); *United States v. Torres*, 911 F.3d 1253, 1257 (9th Cir. 2019) (same); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012) (same); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022) (same). After assuming the Second Amendment protects unlawful aliens, each of these circuits concluded § 922(g)(5) was constitutional.

**MEMORANDUM DECISION AND ORDER RE MOTION TO DISMISS INDICTMENT - 5**

Only the Seventh Circuit has concluded the Second Amendment protects unlawful aliens. In *United States v. Meza-Rodriguez*, 798 F.3d 664, 670 (7th Cir. 2015), the Seventh Circuit concluded the term "the people" in the Second Amendment "has the same meaning as it carries in other parts of the Bill of Rights." To determine whether the defendant was among "the people" the Second Amendment protects, the Seventh Circuit considered whether the defendant had "developed substantial connections with this country" while unlawfully present. *Id.* Like the other circuit courts which have considered the constitutionality of § 922(g)(5)(A), the Seventh Circuit held this statute was constitutional. *Meza-Rodriguez*, 798 F.3d at 670.

The parties' evolving arguments in this case reflect the challenges with resolving the first prong, particularly in the context of Bernabe-Martinez's as applied challenge. In his opening brief, Bernabe-Martinez argues that, despite his lack of citizenship, "he remains part of 'the people' that the Second Amendment protects." (Dkt. 19 at p. 6). In support, he argues "the Second Amendment's plain text covers [his] conduct [because] he inadvertently came into possession of a rifle and kept it for protection." (*Id.* at p. 23). He further describes his conduct as "possessing a rifle to protect his family." (*Id.* at p. 27).

At the hearing, however, Bernabe-Martinez shifted his argument slightly to assert his possession of a firearm in his home was adequate for Second Amendment protection, regardless of whether he possessed the firearm for protection, presumably because factual issues in the case suggest he was using the firearm to threaten his wife, not to protect her.[3] Alternatively, Bernabe-

---

[3]  Contrary to Bernabe-Martinez's representations in his briefing that he possessed the firearm for protection of his family, the Government proffered evidence that law enforcement

Martinez "asks the Court to join the Seventh Circuit and apply the 'substantial connections test' to *Bruen*'s first step." (Dkt. 19 at p. 22) (citing *Meza-Rodriguez*, 798 F.3d 664). In support, Bernabe-Martinez attests, among other things, that he came to the United States when he was twelve years old; he has family in the United States, including a wife and a child who are lawful permanent residents and two other children who are citizens; he submitted a DACA application, which was denied; and he is in the process of obtaining legal status. (Dkt. 19-2).

In response to Bernabe-Martinez's motion, the Government offers several arguments that Bernabe-Martinez is not among "the people" the Second Amendment protects. First, the Government argues Supreme Court precedent demonstrates the Second Amendment only protects citizens of the United States. In support, the Government quotes the Supreme Court's repeated references in dicta in *Heller*, *McDonald*, and *Bruen* to "citizens," which suggest the Second Amendment only protects "ordinary, law-abiding citizens." *See, e.g.*, *Bruen*, 597 U.S. at 8 ("In [*Heller*] and [*McDonald*], we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."). (*See also* Dkt. 21 at pp. 4-5) (citing multiple references in *Heller*, *McDonald*, and *Bruen* to Second Amendment's protection of "citizens").

Second, the Government argues that, although the Supreme Court in *Bruen* rejected the Court of Appeals' reliance on a means-end scrutiny to analyze the Second Amendment, the Supreme Court "blessed" the holdings in the Fourth, Fifth, Eighth, and Eleventh Circuits that

---

encountered Bernabe-Martinez after his wife called 911 and reported Bernabe-Martinez threatened her by pointing the firearm at her chest. Bernabe-Martinez countered the proffer with evidence the prosecutor dismissed the criminal charge because, later, the victim could not recall the incident.

**MEMORANDUM DECISION AND ORDER RE MOTION TO DISMISS INDICTMENT - 7**

"undocumented immigrants are not among 'the people' protected by the Second Amendment." (Dkt. 21 at p. 7). *See Jimenez-Shilon*, 34 F.4th at 1043-47 (concluding illegal aliens "do not enjoy the right to keep and bear arms" under the Second Amendment's "text and history"); *Carpio-Leon*, 701 F.3d at 979 (concluding "illegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection"); *Flores*, 663 F.3d at 1023 (concluding "the protections of the Second Amendment do not extend to aliens illegally present in this country"); *Portillo-Munoz*, 643 F.3d at 442 (concluding "the phrase 'the people' in the Second Amendment . . . does not include aliens illegally in the United States").

Third, the Government argues that "colonial-era statutes did not extend the right to bear arms to those who were, at the time, not considered part of the political community" and that "the Bill of Rights codified this understanding of the right to bear arms as being connected with membership in and preservation of the political community." (Dkt. 21 at pp. 9-10). In support, the Government cites numerous authorities discussing colonial history and notes colonial governments disarmed certain groups of people, including Native Americans, Catholics, and persons who refused to swear allegiance to a particular state or the United States. (*Id.* at pp. 8-10).

Finally, at the hearing, the Government argued that determining the first prong of *Bruen* involved a three-part test, i.e., whether the challenged statute regulates "ordinary, law-abiding, adult citizens [as] part of 'the people' whom the Second Amendment protects"; whether the regulated weapon is commonly used today for self-defense; and whether the Second Amendment's plain text protects the defendant's proposed course of conduct. *Bruen*, 597 U.S. at 31-32. Relying on this test, the Government asserts Bernabe-Martinez cannot establish either that he is a law-abiding citizen or that the Second Amendment protects his proposed course of conduct.

**MEMORANDUM DECISION AND ORDER RE MOTION TO DISMISS INDICTMENT - 8**

The parties' numerous and varying positions regarding the correct analysis for determining whether the Second Amendment's plain text covers Bernabe-Martinez's conduct highlights what courts have described as a "large and complicated," unresolved constitutional issue. *See Torres*, 911 F.3d at 1261 (quoting *Huitron-Guizar*, 678 F.3d at 1169). Regarding this complicated issue, the Ninth Circuit has concluded that unnecessarily determining whether an unlawful alien falls within the Second Amendment's scope is "imprudent." *Torres*, 911 F.3d at 1261; *see also United States v. Gil-Solano*, No. 3:23-cr-00018-MMD-CLB, 2023 WL 6810864, at *2 (D. Nev. Oct. 16, 2023) (declining to resolve issue based on "ambiguity of controlling precedent" and "the canon of constitutional avoidance").

If determining the issue is imprudent for the Ninth Circuit, it is even more so for this Court. Accordingly, like the Ninth Circuit and other courts, this Court declines to reach unnecessarily a conclusion regarding the complicated, unresolved constitutional question of whether the Second Amendment protects Bernabe-Martinez. Rather, this Court assumes the Second Amendment protects Bernabe-Martinez but concludes § 922(g)(5)(A) is constitutional as applied because the Government has shown that statute is consistent with the Nation's historical tradition of firearm regulation.

### B.  The Nation's Historical Tradition of Firearm Regulation

Addressing *Bruen*'s second prong—whether § 922(g)(5)(A) is consistent with the Nation's historical tradition of firearm regulation—the Government acknowledges "[i]llegal immigration is an issue that substantially postdates the Second Amendment." (Dkt. 21 at p. 14). Accordingly, for § 922(g)(5)(A) to withstand constitutional review, the Government must "identify a well-established and representative historical analogue." *Bruen*, 597 U.S. at 30.

Regarding this burden, the Government identifies various authorities discussing colonial laws forbidding certain classes of individuals from possessing firearms.[4] At the hearing, the Government argued colonial "legislators felt abundantly free" to consider who they thought were loyal and supportive enough of American society to bear arms. For example, the Government notes "colonial governments disarmed persons who refused to 'swear an oath of allegiance to the state or the United States'" and asserts the Bill of Rights codified "this understanding of the right to bear arms as being connected to citizenship and to membership in and preservation of the political community." (Dkt. 21 at p. 12). In other words, the Government asserts that § 922(g)(5)(A) is relevantly similar to Founding-era laws prohibiting the possession of firearms by those who did not swear an oath of allegiance to the sovereign and that these laws provide a historical analogue.

The Court agrees pre-Second Amendment laws requiring loyalty oaths imposed comparable burdens on firearms possession with comparable justifications. During the revolutionary period, "several states passed laws providing for the confiscation of weapons owned by persons refusing to swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506 (2004); *accord* Pratheepan Gulasekaram, *"The People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. REV. 1521, 1546 (2010)

---

[4] By way of example, the Government notes that colonial Massachusetts and Virginia forbid Native Americans from possessing firearms and that colonial authorities disarmed certain religious groups, including Catholics and Quakers. (*See, e.g.*, Dkt. 21 at pp. 11-12). The Government emphasizes that such discriminatory classifications are reprehensible, but nonetheless, it identifies them as examples of the colonial understanding of the right to bear arms which the Bill of Rights codified.

("Some colonial governments also required loyalty oaths before firearm possession."). Following the Declaration of Independence, "the new state governments returned to colonial precedent and framed their police power to disarm around a test of allegiance." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 159 (2007). If an individual refused to take an oath of loyalty, the resulting disarmament flowed, at least in part, from the government's belief the individual was dangerous to the Nation's founding principles of government. Gulasekaram, *supra*, at 1547-48; Churchill, *supra*, 158-61; Cornell & DeDino, *supra*, 506-08; *see* Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 229 (1999). The court in *Gil-Solano* identified numerous states enacting oath of allegiance laws related to firearms restrictions during the Founding-era, including Pennsylvania, Virginia, Massachusetts, Maryland, North Carolina, Rhode Island, and New York. 2023 WL 6810864, at *3-4 n.5.

As other courts have concluded, § 922(g)(5)(A) tracks "closely with the historical restrictions on firearm access to individuals who did not swear an oath of allegiance." *United States v. Leveille*, 659 F. Supp. 3d 1279, 1285 (D.N.M. 2023); *see also Gil-Solano*, 2023 WL 6810864, at *5 ("Relative to § 922(g)(5)(A), early American laws requiring loyalty oaths imposed comparable burdens on firearms possession, with comparable justifications."). "[T]he question of *how* appears the same—a total prohibition of firearm access—and *why* appears quite similar— because, in the view of the legislature, prohibiting firearms to those who have not demonstrated allegiance to this nation might put weapons in the hands of those who would do the nation harm." *Leveille*, 659 F. Supp. 3d at 1285; *see also United States v. Vizcaino-Peguero*, No. 22-168 (FAB), 2023 WL 3194522, at *4 (D.P.R. Apr. 28, 2023) (noting Congress in enacting § 922(g)(5) "deemed

**MEMORANDUM DECISION AND ORDER RE MOTION TO DISMISS INDICTMENT - 11**

aliens without legal status to be untrustworthy and in need of disarming"). Accordingly, the Court concludes the Government has demonstrated § 922(g)(5)(A) is consistent with the Nation's tradition of firearm regulation and denies Bernabe-Martinez's motion to dismiss the indictment.

## IV. ORDER

**IT IS ORDERED that:**

1. Defendant's Motion to Dismiss the Indictment (Dkt. 19) is **DENIED**.

2. Defendant's Motion for Leave to File Overlength Brief (Dkt. 20) is **GRANTED**.

3. The Government's Motion to Supplement Authority (Dkt. 28) is **GRANTED**.

4. Pursuant to the Speedy Trial Act's provision on any pretrial motion, 18 U.S.C. § 3161(h)(1)(D), speedy trial time shall be excluded from (A) the conclusion of the hearing on Defendant's Motion to Dismiss the Indictment on January 31, 2024, through (B) the date of issuance of this order. The Court will reset trial in this matter by separate order.

DATED: February 26, 2024

Amanda K. Brailsford
U.S. District Court Judge